[No. 8002–8–II. Division Two. August 1, 1986.]

EDWARD LITZ, ET AL, *Appellants,* v. PIERCE COUNTY, *Respondent.*

*Allan L. Overland,* for appellants.

*William H. Griffies, Prosecuting Attorney,* and *Ronald L. Williams, Deputy,* for respondent.

REED, J.—Edward and Doris Litz appeal the summary

judgment dismissing their action against Pierce County for damages arising from the County's curtailment of ferry service to Ketron Island. We affirm.

In 1961, Ketron Island Enterprises, Inc. (KIE), the owner of Ketron Island, deeded land on the island to Pierce County for use as a ferry landing. According to Inga Morris, widow of the then president and majority shareholder of KIE, the consideration for this conveyance was that the County would provide efficient ferry service to the island.[1] Ferry service to the island began in 1961. In that same year, the Litzes purchased property on the privately owned island and, in 1969, they built a permanent home there. According to Edward Litz, he and his wife built their home on the island in reliance upon continued and adequate ferry service. The Litz property, however, did not abut the ferry landing.

Until November 1981, the ferry schedule consisted of four trips from Ketron to Steilacoom at 7 a.m., 10:20 a.m., 4 p.m., and 5:45 p.m., and five trips from Steilacoom to Ketron at 7:30 a.m., 9:20 a.m., 11 a.m., 3:45 p.m., and 5:30 p.m. On November 30, 1981, Pierce County reduced the ferry schedule to one trip from Ketron to Steilacoom at 7:10 a.m. and one trip from Steilacoom to Ketron at 4:30 p.m. On March 10, 1982, the Pierce County Council adopted an ordinance, after public notice and a public hearing, incorporating the new, "emergency" ferry schedule. The reason given for the restricted schedule was the severely weakened structure of the Ketron Island ferry landing. On June 15, 1982 the county council passed a resolution authorizing the expenditure of $90,000 for repairs to the Ketron Island landing. Apparently, the repairs authorized were of a "patchwork" nature, to last 5 to 10 years; more permanent repairs would require the expenditure of approximately $1

---

[1]Despite Inga Morris' assertion, insofar as we are informed, there is no record of any such agreement with KIE. The KIE deed contains no limitations, restrictions, or conditions subsequent. In any case, this is not a suit to enforce *any* such agreement. Although the record is not clear on this point, it appears that the stop at Ketron was added to an existing ferry service to McNeil and Anderson Islands.

million.

Following the curtailment of ferry service, the Litzes temporarily moved to Tacoma, where Edward Litz was employed. For a time they attempted to commute to and from Ketron Island by small boat. They built another home in Tacoma and they put their Ketron Island home up for sale, but they have been unsuccessful in finding a buyer. A real estate broker gave his opinion, in an affidavit, that the value of the Litz property "has been sharply reduced because of the limited ferry service."

In March 1983, the Litzes commenced this action, asking for $250,000 in damages for the "*de facto* taking and inverse condemnation of [their] property and property rights." The Litzes also claimed damages on grounds of equitable estoppel. Pierce County moved for and was granted summary judgment.

The Litzes base their theory of inverse condemnation on the contention that their access by county ferry to Ketron Island is a vested property right and that the substantial impairment of their access caused by the reduction in ferry service amounts to a "taking" of that property right which requires compensation under article 1, section 16 of the state constitution.[2] The Litzes analogize their access to the island by the ferry route to an abutting property owner's access to a public highway. In *Keiffer v. King Cy.,* 89 Wn.2d 369, 372, 572 P.2d 408 (1977), the court held that an abutting property owner's right of access to a public right of way is a property right, which, if taken or damaged for public use, requires compensation under the state constitution. *See also McMoran v. State,* 55 Wn.2d 37, 345 P.2d 598 (1959); *Walker v. State,* 48 Wn.2d 587, 295 P.2d 328 (1956). To be compensable, impairment of access to a public way must be substantial. *Keiffer v. King Cy., supra.* The Litzes maintain that, because a public ferry is part of a

---

[2]Const. art. 1, § 16 states, in relevant part: "No private property shall be taken or damaged for public or private use without just compensation having been first made . . ."

public highway, *State ex rel. Wash. Nav. Co. v. Pierce Cy.*, 184 Wash. 414, 423, 51 P.2d 407 (1935), *modified on rehearing*, 187 Wash. 695, 60 P.2d 16 (1936), the substantial impairment of their access to their property caused by the severely restricted ferry service is, under the authority of *Keiffer v. King Cy., supra,* compensable.

■ This issue is one of first impression for this and, as far as we can ascertain, for any jurisdiction. The issue is both a question of rights of access in the unique context of a ferry route and a question of a county government's authority and discretion in the setting of ferry schedules. The unusual nature of this dispute makes possible only a limited analogy to the right of access cases involving roads and highways on land, and, at best, allows for only a limited application of legal doctrines that have developed in access cases. We will assume, however, that because of the limited access to the mainland inherent in their status as island landowners, the Litzes are "abutting" landowners even though their property does not physically adjoin the ferry landing.

Courts of this state have considered a public ferry to be "a continuation of a public highway", *Gross v. Washington State Ferries*, 59 Wn.2d 241, 244, 367 P.2d 600 (1961), part of a county road system, *State ex rel. King Cy. v. Murrow,* 199 Wash. 685, 691, 93 P.2d 304 (1939), and "part of a highway [that] necessarily subserves public interest and convenience." *State ex rel. Wash. Nav. Co. v. Pierce Cy.,* 184 Wash. at 423.[3] However, access to a public ferry is significantly different, both in terms of time and place, from access to a public highway or county road on land. In this case, access to a public ferry in terms of *place* of access is not at issue. This is not a case where a ferry landing has been moved or where a ferry route has been abandoned or terminated. In that "traditional" sense of access of place, the Litzes have not lost their access to the public ferry, nor

---

[3]Ketron Island, however, has no public roads. The record indicates that the only public land on the island is that comprising the ferry landing.

has that access been limited. Thus, the property rights of an abutting landowner in his access to a public right of way, *Keiffer v. King Cy., supra,* are not, strictly speaking, implicated here. What the Litzes are asserting here is a property right in a particular ferry schedule which, if "taken or damaged," is compensable. We decline, however, to recognize such a property right.

When the government takes or damages an abutting landowner's access to a public way, which is characterized as an easement of ingress and egress, *State v. Calkins,* 50 Wn.2d 716, 718, 314 P.2d 449 (1957), the landowner's property rights in his land are diminished and the government's property interest in the public way is correspondingly increased. *See* Stoebuck, *Police Power Takings, and Due Process,* 37 Wash. & Lee L. Rev. 1057, 1084–85 (1980). That right of access, quite understandably, "attaches" to the land. *State v. Calkins, supra.* In the context of a ferry route, however, that property right of access cannot be said to encompass a right to a particular ferry schedule. A particular ferry schedule, even though it temporarily affects access to property, does not rise to the level of a property right, such as an easement of ingress and egress, that should be subject to judicial recognition. A ferry schedule does not "attach" to the land and it is not a property right which can be taken or damaged so as to support an action for inverse condemnation. The recognition of such a property right would unduly hamper the ability of a municipality, a county, or the State to provide efficient and convenient ferry service. *Cf. Wylde v. Seattle,* 162 Wash. 583, 593–94, 299 P. 385 (1931) ("An individual can acquire no vested right as against the public in the continued service of a public utility. Such a doctrine, once admitted, would destroy the convenience as a public utility. It would then become hampered, and subject to the control of the individual, and made to subserve such interests, to the detriment of the public welfare." (quoting *Asher v. Hutchinson Water, Light & Power Co.,* 66 Kan. 496, 71 P. 813, 814 (1903)).

Further, this conclusion by no means leaves island dwellers or others who are dependent upon ferry service without recourse or avenue of complaint when they believe the have been unfairly affected by a reduction in ferry service. Such parties may, as in this case, voice objection to the decisionmaking authority before the adoption of a new schedule.[4] They may seek judicial review if they think that the particular governmental authority has acted arbitrarily and capriciously in curtailing the level of service. Finally, they may resort to the political process and attempt to elect officials who may be more responsive to their needs.[5]

In deciding as we do, we do not close our eyes to the fact that, whether or not we recognize that a right of access, compensable if taken or damaged, encompasses the frequency of ferry trips, the Litzes' ability to get to and from the mainland *is* hindered by the reduction in ferry service. Our sympathy for their plight, however, cannot move us to find a claim for inverse condemnation where no basis for such a claim exists. A ferry schedule cannot be tailored to purely individual needs of a landowner on a private island.

---

[4]With regard to the state ferry system, RCW 47.60.330(1) requires:
*Public participation.* (1) Before a substantial expansion or curtailment in the level of service provided to ferry users, or a revision in the schedule of ferry tolls or charges, the department of transportation shall consult with affected ferry users. The consultation shall be: (a) By public hearing in affected local communities; (b) by review with the affected ferry advisory committees pursuant to RCW 47.60.310; (c) by conducting a survey of affected ferry users; or (d) by any combination of (a) through (c).
Although no similar requirement of public participation is imposed upon counties that operate ferries, *see* RCW 36.54.010, Pierce County chose, in this instance, to solicit views of affected ferry users by means of a public hearing.

[5]In *Woody v. Port of Seattle,* 118 Wash. 163, 167, 203 P. 59 (1922), where the action of the Port in abandoning a ferry route to West Seattle was challenged, the court noted: "[i]n the case of [the Port], . . . [e]very detail of its operation can be reviewed by the people and corrected, if desired, by the election of officers for that purpose, or by the act of the legislature, if it sees proper."
Additionally, the particular circumstances may in some cases, although not in this one, provide a legal basis for damages in lieu of the desired ferry service. For instance, had the County here given the Litzes assurances that a certain level of ferry service would be maintained, the legal basis for their claim of damages might be strengthened. See discussion *infra*.

The County, in this instance, held a public hearing to hear the individual and collective views of ferry users before passing the ordinance changing the ferry schedule. Nevertheless, those views do not limit the discretion of the county in deciding what level of service will be provided.

■ The legislative authority of a county exercises the broadest of discretion in determining the level of service provided to ferry users. *See* RCW 36.54.010. As with other "types" of public roads, ferries should serve the public interest and convenience. Ferry service, however, can be regularly manipulated to serve changing public needs by expansion or curtailment of ferry service. The level of ferry service must, of course, be within the fiscal means of the authority providing that service, and the decisions regarding the level of service must necessarily take into account operating and maintenance costs. *Cf. Wylde v. Seattle,* 162 Wash. at 601 (city may abandon part of streetcar line where, considering all the circumstances, "[t]he expense of operating the line is far greater than is justified by the convenience of the service to anyone . . ."); *State ex rel. Howard v. Seattle,* 154 Wash. 475, 479, 282 P. 829 (1929) ("If the appellant's position were sustained, it would mean that the city could not, at any time or under any circumstances, abandon any part of its [streetcar] system, if such abandonment would be a material inconvenience to the patrons of that portion of the system, even though operated at a loss."). It is axiomatic that the efficient expenditure of public funds is in the public interest.[6]

---

[6]In *Wylde v. Seattle, supra,* the court acknowledged that, in the circumstances of the decision to abandon a portion of a streetcar line,

> the public interest occupies two different, and possibly antagonistic, positions. On the one hand, there is the interest of the public as manifested by persons who desire to use the railway; on the other hand, one phase of the public interest would be subserved by abandoning a utility, owned by a municipal corporation, which is operated at a loss.

162 Wash. at 594. However, the court went on to say that:

> In so far as the public interest should be considered by the courts in connection with this litigation, great weight should be given to the action of the city council, which has by ordinance directed the abandonment of the service, as

As with other discretionary exercises of legislative authority, decisions regarding levels of ferry service are subject to judicial review. Courts, however, may overturn a county's exercise of legislative authority only for manifest abuse of discretion, *i.e.,* for arbitrary and capricious conduct. *Duckworth v. Bonney Lk.,* 91 Wn.2d 19, 34, 586 P.2d 860 (1978); *J & B Dev. Co. v. King Cy.,* 29 Wn. App. 942, 947, 631 P.2d 1002 (1981), *aff'd,* 100 Wn.2d 299, 669 P.2d 468 (1983). The Litzes do not, however, challenge the County's exercise of authority but instead claim damages resulting from that exercise.[7]

■■ Having rejected their claim for damages based upon inverse condemnation, we now turn to the Litzes' second ground for damages, equitable estoppel. The doctrine of equitable estoppel applies when a party acts to his prejudice in reasonable reliance on the assurances of another. *Emrich v. Connell,* 41 Wn. App. 612, 623, 705 P.2d 288 (1985), *rev'd on other grounds,* 105 Wn.2d 551, 716 P.2d 863 (1986). The doctrine will be applied against the State or a political subdivision "when necessary to prevent a manifest injustice, and the exercise of governmental powers will not thereby be impaired." *Shafer v. State,* 83 Wn.2d 618, 622, 521 P.2d 736 (1974). The doctrine's application against local government is not, however, favored, and the requisite elements must be proven with clear, cogent, and convincing evidence. *Chemical Bank v. WPPSS,* 102 Wn.2d 874, 905, 691 P.2d 524 (1984). The elements of equitable estoppel are:

---

the legislative body of the city must be presumed to be the best judge of the public interest and how the same will be best subserved.
162 Wash. at 594.

[7]We stress that we do not deal here with any claim for damages based upon an asserted breach of contract between the County and KIE to provide "efficient" ferry services in consideration for the deed to the landing. Thus, we express no opinion on whether KIE or its successors in interest might have such a claim, or a right of re-entry on breach of condition subsequent. The Litzes' only claims were for damages based on a constitutional "taking" of their property or on *equitable* estoppel arising from continuous operation on a *certain schedule.*

(1) an admission, statement, or act, inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party arising from permitting the first party to contradict or repudiate such admission, statement, or act.

*Shafer v. State,* 83 Wn.2d at 623. Additionally, the above elements are qualified by the requirement that the reliance on another's conduct must be reasonable. *Leonard v. Washington Employers, Inc.,* 77 Wn.2d 271, 280–81, 461 P.2d 538 (1969). The elements of equitable estoppel present essentially factual issues. *Emrich v. Connell,* 41 Wn. App. at 624.

■ The Litzes argue that there is at least an issue of fact as to whether they have met the requirements of an equitable estoppel claim. If there is a genuine issue of material fact when the evidence and all reasonable inferences from the evidence are considered in the light most favorable to the nonmoving party, then summary judgment should not be granted. *Hontz v. State,* 105 Wn.2d 302, 311, 714 P.2d 1176 (1986). The County argues that the Litzes have not shown that their reliance was reasonable, and, further, that application of estoppel here would impair the County's exercise of governmental powers.

The grounds for the Litzes' estoppel claim are the County's acceptance of the deed to the ferry landing, the 8 years of ferry service, consisting of several runs per day, before they built a home on Ketron Island, and the more than 12 years of the same service after their move to the island. These grounds, without more, are insufficient. The Litzes have not provided evidence that, under the circumstances, they could reasonably rely upon a particular level of service. They received no assurances from the County that ferry service would continue at the same level indefinitely. They, thus, did not attempt to reduce the risk inherent in moving permanently to a small, private island. The fact that the County accepted the deed to the ferry landing only shows that the County intended to provide ferry service, but not a

particular level of service. Further, acceptance of the Litzes' claim of estoppel would excessively impair Pierce County's exercise of its governmental powers. The result would be to enable one or more landowners on a private island to force a local government either to undertake the costly repairs necessary to continue a specified ferry schedule on an inefficient ferry route or otherwise pay damages that might equal the costs of such repairs.

The Litzes having failed to establish a genuine issue of fact as to the elements of their equitable estoppel claim, the summary judgment must be affirmed.[8]

WORSWICK, C.J., and ALEXANDER, J., concur.

---

[8]When federal questions are involved, the evidentiary standard on summary judgment is governed by the substantive evidentiary standard that applies at trial in a particular case. *Anderson v. Liberty Lobby, Inc.,* ___ U.S. ___, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Because Washington courts look to federal court interpretations of federal rules for guidance, *Darling v. Champion Home Builders Co.,* 96 Wn.2d 701, 706, 638 P.2d 1249 (1982), the Litzes more likely could surmount a summary judgment motion only with "clear, cogent, and convincing evidence" of facts establishing a prima facie case of equitable estoppel.