William MOFFATT a/k/a Bill Moffatt, Sherralee Howe, and Alaska Right–To–Life, Inc., an Alaska corporation, Petitioners,

v.

Carolyn BROWN, M.D., and Laurance C. Marshburn, M.D., for themselves individually, as well as on behalf of all others similarly situated, Respondents.

No. S–2126.

Supreme Court of Alaska.

March 11, 1988.

Rehearing Denied April 11, 1988.

Cheri C. Jacobus, Ross, Gingras, Bailey & Miner, Wohlforth & Flint, and Brent Wadsworth, Anchorage, for petitioners.

Edgar Paul Boyko, Boyko, Davis, Dennis, Baldwin & Breeze, and Elizabeth I. Johnson, Johnson and Holen, Anchorage, for respondents.

D. John McKay, Middleton, Timme & McKay, Anchorage, amicus curiae for Alaska Press Club.

Before MATTHEWS, C.J., and
RABINOWITZ, BURKE, COMPTON
and MOORE, JJ.

## OPINION

MOORE, Justice.

In this appeal, we review the standard for ruling on summary judgment motions in libel actions. We hold that the superior court erred in denying summary judgment in favor of the defendants William Moffatt, Sherralee Howe and Alaska Right-to-Life, Inc.

## I.

Dr. Carolyn Brown, a practicing obstetrician in Palmer, submitted her name to Governor Jay Hammond for appointment to the Alaska State Medical Board in a letter dated April 8, 1981. The appointment process resulted in some confusion in the governor's office. A letter appointing Dr. Brown to the Medical Board, dated May 19, 1981, was signed by Governor Hammond's signature machine. Dispatch of the letter was to await the Governor's approval. Dr. Brown never received this letter, but copies of it were circulated to various other executive departments, resulting in Dr. Brown's receipt of a congratulatory letter from the Lieutenant Governor and reports of the appointment in local papers.

Upon learning of the Brown appointment, Alaska Right-to-Life published an article in the Right-to-Life Hotline Newsletter about the possibility of Dr. Brown's appointment to the Medical Board. The article contained the following statement which is the subject of this libel suit:

> We cannot believe that Governor Hammond will bow to anti-life pressure to appoint an abortionist whose methods were so horrible as to cause a boycott by every nurse employed at Valley Hospital.[1]

The article concluded by urging the paper's 15,000 subscribers to contact Governor Hammond to register opposition to the Brown appointment. The primary author of the article was William Moffatt.

Dr. Brown received a letter from Governor Hammond dated July 27, 1981, informing her that she had not been appointed to the Medical Board. The Governor acknowledged the confusion over the appointment and explained that ultimately he chose to adhere to his prior policy of choosing candidates recommended by the Alaska State Medical Association. The Alaska State Medical Association did not recommend Dr. Brown because it felt that the vacancies on the Medical Board, which previously had been held by Anchorage doctors, should again be filled by Anchorage doctors. Governor Hammond testified that he never read any of the letters he received either supporting or opposing the Brown nomination.

Moffatt asserts in his deposition and in his affidavit that he investigated and confirmed the facts surrounding his statements by consulting with Robert Ogden, the hospital administrator at Valley Hospital during the relevant times, by attending public meetings of the Valley Hospital Board, and by reading accounts of the incident in the local newspaper. Furthermore, Moffatt stated in his affidavit that he always believed the story to be true, and never entertained any doubts that the statements he made were untrue.

Dr. Brown filed this libel suit in the superior court in 1981. In June of 1984, the superior court ruled on defendants' motion for summary judgment, dismissing several of Dr. Brown's claims. However, the court refused to grant summary judgment with respect to the particular statement presently before this court. Moffatt, Howe and Alaska Right-to-Life renewed their motion for summary judgment after the United States Supreme Court issued its decision in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986). The defendants claim that under *Anderson,* the "genuine issue of material fact" standard used by the superior court in denying their summary judgment

1. Dr. Brown utilized the prostaglandin method for second trimester abortions which she performed. Many of the nurses at Valley Hospital objected to this procedure.

motion is unconstitutional. Instead, the court should have applied the "clear and convincing evidence" standard when determining whether to grant or deny summary judgment on the issue of actual malice. The superior court again denied the motion, and we granted Moffatt and Alaska Right-to-Life's petition for review.

## II.

In *New York Times Co. v. Sullivan*, the Supreme Court placed certain constitutional limitations on state defamation laws. To recover damages for libel, a public official must prove two things. The public official must prove first, that the statement was false, and second, that the false statement was made with "actual malice." 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964). *See also* L. Tribe, *American Constitutional Law*, 863–72 (2d. ed. 1988).

In *Curtis Publishing Co. v. Butts*, the Court extended the *N.Y. Times* protections to public figures as well as public officials. 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967). Later, in *Gertz v. Welch*,[2] the Court defined the parameters of "public figure," stating:

> For the most part those who attain this [public figure] status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789, 808 (1974).

■ We agree with the superior court's conclusion that Dr. Brown is a public figure. Dr. Brown voluntarily sought appointment to the Medical Board, one of the functions of which is to regulate abortion procedures in the State of Alaska. As such, the public has an interest in the qualifications of a potential appointee to the Medical Board. Thus, Dr. Brown, who voluntarily placed herself in a position of public attention and comment, is a public figure, and the *N.Y. Times* protections here apply.

At issue in this appeal is the "actual malice" prong of the *N.Y. Times* test. Although Moffatt and Alaska Right-to-Life do not concede that the statements in question were false, they contend in their summary judgment motion that Dr. Brown's evidence does not show actual malice.

To establish actual malice, a public figure must prove by clear and convincing evidence that the declarant acted with knowledge of the statement's falsity or in reckless disregard of the statement's truth or falsity. *N.Y. Times*, 376 U.S. at 279–80, 84 S.Ct. at 725, 11 L.Ed.2d at 706. The actual malice standard is a difficult one to satisfy. Not only is the burden of proof on the plaintiff to show actual malice by *clear and convincing evidence*, but also, the standard is a subjective one. As the Court in *St. Amant v. Thompson* explained:

> These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that *the defendant in fact entertained serious doubts as to the truth of his publication.* Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968) (emphasis added). Thus, the trier of fact is required to determine whether the publication was made in good faith. In some cases, this can be done solely "by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity." *Id.* However, in other cases the defend-

---

2. More recently, the court held that a private figure speaking on a matter of private concern can recover both compensatory and punitive damages without proof of actual malice. *See* *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 758–59, 105 S.Ct. 2939, 2945, 86 L.Ed. 2d 593, 602–03 (1985).

ant's testimony alone would be insufficient to prevent a finding of actual malice:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Id.* at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267–68 (footnote omitted).

We have previously discussed the actual malice standard in *Green v. Northern Publishing Co.*, 655 P.2d 736 (Alaska 1982), *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983). We described the requisite state of mind for a finding of actual malice against a media defendant, which we today reaffirm, as follows:

> "Reckless disregard," for these purposes, means conduct that is heedless and shows a wanton indifference to consequences; it is conduct which is far more than negligent. There must be sufficient evidence to permit the inference

that the defendant must have, in fact, *subjectively entertained serious doubts as to the truth of his statement.*

*Green,* 655 P.2d at 742 (emphasis in original; citations omitted).

### III.

Moffatt and Alaska Right-to-Life argue that the proper standard for ruling on summary judgment motions in libel cases is the standard recently enunciated by the United States Supreme Court in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In *Anderson,* the Court held:

> [W]here the factual dispute concerns actual malice, clearly a material issue in a New York Times case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.

*Id.* at 255–56, 106 S.Ct. at 2514, 91 L.Ed.2d at 216 (footnote omitted). We determine that in *Anderson* the Court did not set out a constitutional standard for ruling on summary judgment motions in libel cases. Instead, the Court interpreted Fed.R.Civ.P. 56 and federal summary judgment practice.[3]

In *Anderson,* the defendants in a libel action in federal district court moved for summary judgment pursuant to Fed.R. Civ.P. 56.[4] In support of that motion, defendants submitted an affidavit of the author of the allegedly libelous statement in which the author stated that he spent sub-

---

**3.** Courts in various states are not in complete agreement in this regard. Some courts believe that *Anderson* set out a constitutional standard. *See Long v. Egnor,* 346 S.E.2d 778 (W.Va.1986). Some courts have skirted the issue by simply incorporating the *Anderson* standard into their state summary judgment practice. *See Camer v. Seattle Post-Intelligencer,* 45 Wash.App. 29, 723 P.2d 1195, 1200 (1986), *cert. denied,* — U.S. ——, 107 S.Ct. 3189, 96 L.Ed.2d 677 (1987); *Litz v. Pierce County,* 44 Wash.App. 674, 723 P.2d 475, 480 n. 8 (1986).

**4.** The federal rule on summary judgments is almost identical to the Alaska rule on summary judgments. Fed.R.Civ.P. 56(c) reads as follows:

> The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

stantial time researching the facts from a wide variety of sources and that he believed the statements were truthful and accurate. Plaintiffs responded to the motion claiming that they presented an issue of actual malice by showing that the author used unreliable sources and failed to verify facts before publishing.

The Court framed the issue in this case as a federal procedural question rather than a constitutional question:

> Our inquiry is whether the Court of Appeals erred in holding that the heightened evidentiary requirements that apply to proof of actual malice in this New York Times case need not be considered for the purposes of a motion for summary judgment. *Rule 56(c) of the Federal Rules of Civil Procedure provides that* summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Id.* at 247, 106 S.Ct. at 2509–10, 91 L.Ed.2d at 211 (emphasis added). The Court then analyzed federal directed verdict practice for the purpose of comparison with federal summary judgment practice. The opinion is not a detailed analysis of free speech law. Instead, it only cursorily mentions *N.Y. Times* and its progeny, and only for purposes of setting out the "clear and convincing evidence" standard applicable to actual malice issues. The Court then arrived at its general holding that "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* at 255–56, 106 S.Ct. at 2514, 91 L.Ed.2d at 216. From this general holding, the Court then set down the specific rule to apply to the libel case before it—namely, that summary judgment should be granted unless "the record could

support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Id.* (footnote omitted).

In subsequent cases, federal circuit courts have applied *Anderson* to any case calling for a summary judgment determination and have not confined its application to first amendment cases.[5] *See, e.g., Richards v. Neilsen Freight Lines,* 810 F.2d 898, 903 (9th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union–Management Pension Fund,* 800 F.2d 742, 746 (8th Cir.1986). Since *Anderson* is a case about federal procedure, the summary judgment standard enunciated therein is not binding on state courts which follow their own state summary judgment procedures.

■ Instead of adopting the summary judgment standard articulated in *Anderson,* we choose to continue our long-standing interpretation of our summary judgment standard as contained in Civil Rule 56(c). Civil Rule 56(c) directs a court to grant a motion for summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Alaska R.Civ.P. 56(c). We decline to incorporate the applicable substantive evidentiary standard into this state's summary judgment practice. We adhere to our prior comments and holding in *Gablick v. Wolfe,* 469 P.2d 391 (Alaska 1970), in which we embraced Rule 56(c)'s traditional summary judgment test. In *Gablick,* appellees argued that, on a summary judgment motion, this court must consider the clear and convincing evidence standard which the court was required to apply when determining whether it would decree reformation for mutual mistake. This court held that Rule 56(c) only requires a showing that a genuine issue of material fact exists to be liti-

5. Justice Brennan, in his dissenting opinion in *Anderson,* noted the broad reach and procedural nature of the majority opinion in that case. *Anderson,* 477 U.S. at 257, n. 1, 106 S.Ct. at 2515 n. 1, 91 L.Ed.2d at 217–18, n. 1 ("[i]n other words, today's decision by its terms applies to all summary judgment motions, irrespective of the burden of proof required and the subject matter of the suit").

gated, and not a showing that a party will ultimately prevail at trial.[6]  *Id.* at 395.

Similarly, when choosing between the summary judgment standard handed down in *Anderson* and the traditional summary judgment test, the New Jersey Supreme Court chose the latter.[7]  *Dairy Stores, Inc. v. Sentinel Publishing Co.,* 104 N.J. 125, 516 A.2d 220, 235–36 (1986).  In retaining the "genuine issue of material fact" test for summary judgment determinations, the New Jersey court explained "that the clear-and-convincing test inevitably implicates a weighing of the evidence, an exercise that intrudes into the province of the jury."[8]  *Id.* at 236.  We agree.

### IV.

■ As a consequence of our holding today, it is somewhat harder for a libel defendant to win summary judgment in our state courts, using the "no genuine issue of material fact" standard, than in federal court.  As already explained, *Anderson* does not make this result constitutionally impermissible.  However, even under our more stringent standard, we find that summary judgment should have been granted to the defendants in this case.

In reviewing the trial court's denial of Moffatt's motion for summary judgment, we are asked to determine whether, after drawing all factual inferences in favor of Brown, the non-moving party, there is a genuine issue of material fact to be litigated.  *Alaska Rent–A–Car, Inc. v. Ford Motor Co.,* 526 P.2d 1136, 1139 (Alaska 1974).  Moffatt, Howe and Alaska Right-to-Life claim that they are entitled to judgment as a matter of law because Dr. Brown presented no evidence showing that Moffatt entertained serious doubts that his statement was untrue.

The actual malice test is a subjective test.  *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267.  The question on summary judgment is whether there is a genuine issue of material fact on whether Moffatt himself entertained serious doubts as to the truth of the statements.[9]

Brown attempts to prove actual malice with evidence that Robert Ogden, the hospital administrator at Valley Hospital and the major source of Moffatt's information, did not provide facts which entirely supported Moffatt's statements that Dr. Brown used methods "so horrible as to cause a boycott by every nurse employed at Valley Hospital."

Ogden testified in his deposition that he never described Dr. Brown's methods as

6.  We do emphasize, however, that in a libel case brought by a public figure against a media defendant, the substantive evidentiary standard must be applied at trial.  Thus, as a matter of constitutional law, the public figure plaintiff must prove actual malice with *clear and convincing evidence* at trial.  *See N.Y. Times,* 376 U.S. at 285–86, 84 S.Ct. at 728, 11 L.Ed.2d 710 (Constitution requires proof to show actual malice with "convincing clarity").

7.  The New Jersey court also seemed to hold that *Anderson* set out both a constitutional requirement in libel cases *and* a federal procedural rule to be applied in all federal cases calling for summary judgment determinations.  *Dairy Stores, Inc.,* 516 A.2d at 236.  For the reasons already mentioned in this opinion, we do not believe that the Court intended this dual holding.

8.  In his dissent in *Anderson,* Justice Brennan expressed similar misgivings:

> I simply cannot square the direction that the judge "is not himself to weigh evidence" with the direction that the judge also bear in mind the "quantum" of proof required and consider whether the evidence is of sufficient "caliber or quality" to meet that "quantum."  I would have thought that a determination of the "caliber and quality," i.e., the importance and value, of the evidence in light of the "quantum," i.e., amount required could *only* be performed by weighing the evidence.
>
> If in fact, this is what the Court would, under today's decision, require of district courts, then I am fearful that this new rule—for this surely would be a brand new procedure—will transform what is meant to provide an expedited "summary" procedure into a full blown paper trial on the merits….

*Anderson,* 477 U.S. at 266–67, 106 S.Ct. at 2519, 91 L.Ed.2d at 223 (Brennan, J., dissenting).

9.  A commentator has suggested that actual malice can be shown by "prepublication information possessed by the defendant, the nature and quality of its sources, the efforts made by the defendant to check out the information and its sources, and the subjective intent of the defendant."  Louis, *Summary Judgment and the Actual Malice Controversy in Constitutional Defamation Cases,* 57 S.Cal.L.Rev. 707, 713 n. 36 (1984).

"horrible." More precisely, Ogden explained that the nurses on the staff objected to the methods used by Dr. Brown in second trimester abortions. However, Moffatt's use of the word "horrible" instead of the word "objectionable" is simply the opinion of the author. As such, it is protected by the First Amendment. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789, 805 (1974).

As for the latter part of the statement in question, Ogden testified in deposition that most, but not all, of the nurses on the nursing staff at Valley Hospital refused to participate in Dr. Brown's second-trimester abortions. Thus, Ogden testified that he was forced to go to the nursing registry for Anchorage nurses to aid in Dr. Brown's second trimester abortions only when, due to scheduling, none of the nurses on the nursing staff would participate in the procedure at that particular time. Furthermore, those nurses who chose not to participate in Dr. Brown's second trimester abortions did so for a variety of reasons, some having nothing to do with the methods used by Dr. Brown. Ogden testified:

> There were those that refused to participate because of the medical situation of that particular procedure and their unsureness of that. There were those that didn't want to participate due to the pressure in the community, whether they felt one way or another on the issue. And then there were those that were opposed to the procedure totally.

The evidence submitted by Brown is relevant to the issue of whether Moffatt's statements were true or false, an issue which is not the subject of this petition for review. On the issue of actual malice, Brown has provided no evidence whatsoever to show that Moffatt subjectively entertained any serious doubts as to the truth of his statements. On the contrary, the record shows that Moffatt did not entertain any doubts with regard to the truth of his statements.

In his affidavit, Moffatt stated under oath that at no time did he entertain any doubts as to the truth of the statement he wrote. Furthermore, Moffatt explained how he carefully confirmed the facts upon which he based the statement: Moffatt had several conversations and spoke at length with Ogden. Moffatt stated that during their discussions, Ogden confirmed the fact that the entire nursing staff boycotted Brown's abortion procedure. Moffatt also attended public meetings of the Valley Hospital Board, at which the public and some nurses discussed the problems with the abortion procedures at Valley Hospital. Additionally, Moffatt also relied on an article published in the *Frontiersman*, a local newspaper, which stated that "the *entire nursing staff* at Valley Hospital refused to assist in second trimester abortions...."

At his deposition, Moffatt confirmed that Ogden told him that "the nurses at the hospital had boycotted ... or, rather, had refused or indicated that they certainly did not wish to participate in the [second trimester] procedures." From this, Moffatt assumed that this "refusal" was by every nurse employed at the hospital.

Ogden confirms much of what Moffatt reasonably relied on in making the disputed statement. In an interview conducted on March 11, 1983, Ogden responded affirmatively to the question of whether he "[knew] of any boycott against Dr. Brown by the nurses." Ogden emphasized that it was not Dr. Brown personally or abortion services in general to which the nurses objected, but it was the particular method of second-trimester abortions which the nurses found offensive. Ogden described the situation which developed at Valley Hospital as escalating gradually:

> There was at first a number of nurses who were willing to help and but as time went on, there became fewer and fewer of the nurses that would help Dr. Brown on ... [second trimester abortions]. So there were times when I had to go to Anchorage and hire nurses from a pool in Anchorage to come and treat patients in those particular areas. I don't really remember it as a, a what I would call a true, you know, boycott where they just up in group and walked out and said we refuse to take care of any patients in the

hospital, like that. It was a gradual problem, where they just gradually, the nurses as an individual choice decided they didn't want to take care of the controversial diagnosis.

In his October 18, 1983 deposition, Ogden testified that he had used the word "boycott" to describe nurses' refusal to participate in Dr. Brown's second trimester abortions. Furthermore, Ogden testified that although he did not originate the use of the word, he "may have" used the word "boycott" in conversations with people prior to this lawsuit.[10]

Finally, in his October 17, 1986 affidavit, Ogden confirmed once again that he told Moffatt that "the nursing staff objected to some of the methods of abortion being used by Dr. Brown." Ogden stated that he made it clear to Moffatt that it was the methods used by Dr. Brown which the nurses found objectionable. Ogden again stated that, as a result of the objections by the nursing staff, he had to get nurses from Anchorage to assist Dr. Brown in her second trimester abortions.

Ogden's testimony confirms Moffatt's belief in the truth of his statements, for Ogden admits to supplying the information upon which Moffatt based his statement. Furthermore, we think that Moffatt's statements were a reasonable interpretation of Ogden's statements.

Brown has proffered evidence to show that Moffatt's statements were untrue. However, Brown has failed to provide any evidence that shows that Moffatt entertained any serious doubts as to the truth of his statements. Instead, the evidence shows that he entertained no doubts at all. The defendant's testimony that he published the statement in good faith should be sufficient to counter a claim of actual malice when (1) the plaintiff has failed to present conflicting evidence, and (2) the circumstances do not indicate that the statement was "fabricated by the defend-

ant, ... the product of his imagination, ... based wholly on an unverified anonymous telephone call ... [or] so inherently improbable that only a reckless man would have put them in circulation." *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 268.

Accordingly, we reverse the superior court's denial of summary judgment in favor of Moffatt, Howe and Alaska Right-to-Life.

### V.

■ We also note the importance of careful judicial attention to summary judgment motions in the context of the first amendment. The Court in *N.Y. Times* stressed a "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times*, 376 U.S. at 270, 84 S.Ct. at 720, 11 L.Ed.2d at 701. The failure of courts to summarily dispose of libel cases where warranted would impede this national commitment by chilling the media's first amendment right to free speech. As the D.C. Circuit aptly stated in *Washington Post Co. v. Keogh:*

> The threat of being put to the defense of a lawsuit brought by a popular public official [or public figure] may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, especially to advocates of unpopular causes.... Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues ... will become less uninhibited, less robust, and less wide-open ....

---

**10.** Ogden also stated that "in looking back on it," he realized that he probably used the word "incorrectly." This would be relevant to the first prong of the *N.Y. Times* test; that is, whether the statement was false. However, after ad-

mitting that he used the word, whether or not he correctly used the word is irrelevant to the *N.Y. Times* requirement of actual malice which is at issue in this case.

365 F.2d 965, 968 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed. 2d 548 (1967).

We REVERSE the superior court's denial of summary judgment and REMAND on entry of judgment in favor of Moffatt, Howe and Alaska Right-to-Life.