**Don LOWELL, Appellant,**

v.

**James C. HAYES, in his personal and in his capacity as Mayor of the City of Fairbanks, Herbert P. Kuss, in his personal capacity, and in his official capacity as the City Attorney for the City of Fairbanks, Alaska, and the City of Fairbanks, an Alaskan Municipal Corporation, Appellees.**

No. S–10967.

Supreme Court of Alaska.

July 22, 2005.

**52.** *Hodges,* 957 P.2d at 960–61.

Michael J. Walleri, Law Offices of Michael J. Walleri, Fairbanks, for Appellant.

Daniel E. Winfree and Aimee A. Oravec, Winfree Law Office, APC, Fairbanks, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

# I. INTRODUCTION

Don Lowell sued the City of Fairbanks (the city), James Hayes, and Herbert Kuss for defamation and violation of his civil rights. He sought actual and punitive dam-ages, as well as declaratory relief. The superior court dismissed his civil rights claim and his request for declaratory judgment and granted summary judgment to defendants on the defamation claim. The court then awarded defendants enhanced attorney's fees under Rules 68 and 37. We affirm all of the superior court's rulings.

# II. FACTS AND PROCEEDINGS

## A. Facts

Former Fairbanks–North Star Borough assemblyman Don Lowell took part in a petition effort to consolidate the City of Fairbanks and Fairbanks–North Star Borough governments. In his capacity as a member of the "consolidation committee" formed to further the consolidation plan, Lowell appeared before the borough assembly and city council, and was featured in local news coverage.

The Alaska Administrative Code, 3 AAC 110.900, requires consultation between petition sponsors and officials of the affected governmental entities:

(a) A petition for incorporation, annexation, merger, or consolidation must include a practical plan that demonstrates the capacity of the municipal government to extend essential city or essential borough services into the territory proposed for change in the shortest practicable time after the effective date of the proposed change. . . .

(b) Each petition must include a practical plan for the assumption of all relevant and appropriate powers, duties, rights, and functions presently exercised by an existing borough, city, unorganized borough service area, and other appropriate entity located in the territory proposed for change. *The plan must be prepared in consultation with the officials of each existing borough, city and unorganized borough service area. . . .*

(c) Each petition must include a practical plan for the transfer and integration of all relevant and appropriate assets and liabilities of an existing borough, city, unorganized borough service area, and other entity located in the territory proposed for

change. *The plan must be prepared in consultation with the officials of each existing borough, city, and unorganized borough service area ....*

(Emphasis added.)

As Lowell notes, nothing in the code defines "consultation," nor does it specify with which officials a consolidation planner must consult. According to Lowell, consolidation petitions are generally submitted to the State of Alaska "Local Boundary Commission" (LBC) with affidavits "attesting to the fact that the plan was developed after consultation with municipal officials of all the affected municipal governments."

In May 1998 Lowell and Juanita Helms, another member of the consolidation committee, discussed consolidation with Hayes, the mayor of Fairbanks. Lowell and Helms asked for permission to discuss consolidation-related issues with the city's staff and department heads, including Kuss, the city attorney. Hayes agreed to this request, and wrote a memorandum to the city's department heads, directing them to cooperate with the consolidation committee. He also notified Kuss in person.

Lowell did not meet with the city department heads, or at least the ones notified by Hayes. According to Lowell, he instead met with certain lower-level city officials and staff to discuss consolidation, and "obtained several documents from the City Clerk's office." Helms also met with various city officials, although she did so only in the context of a mayoral campaign and service as director of a volunteer police organization, and not specifically for the purpose of planning consolidation.

In October 1998 Lowell filed a draft consolidation petition with the LBC. Lowell had given a copy of this draft petition to Hayes in August of that year with a cover letter requesting "informal review" and "constructive criticism." Hayes did not recall receiving the draft petition, but it apparently included unsigned copies of Lowell's affidavit and other signed submissions to the LBC, to the effect that city and borough officials were consulted during development of the transition plan petition.

At a November 1998 city council meeting, concerns were raised that consolidation committee members had not met with city department heads or council members. Council members "asked Kuss to contact the LBC to try to ensure that, before a final petition was approved, Lowell would indeed consult with the City as required." The following month, Kuss informed Dan Bockhorst, a staff member to the LBC, of "the City's concern that, based on the language of Mr. Lowell's proposed affidavit and petition paperwork, the LBC might be misled as to the extent of the City's involvement in or agreement with the substance of the proposed petition." After Kuss explained to Bockhorst that Lowell had "formulated the 'transition plan' without input or critique from City officials and department heads," Kuss asked Bockhorst whether criminal perjury charges could apply. Although Kuss insists that he never actually threatened Lowell with prosecution, Bockhorst did inform Lowell of the substance of this discussion.

Lowell appeared at a September 1999 city council meeting, and read a statement into the record. He noted the complaints "that the Consolidation Committee did not meet with the Council and all city department heads in developing the transition portion of the plan." Lowell admitted that this was because "we found that was not necessary," and explained that "we obtained most of the petition-related data including information in the transition plan from public documents and from some city and borough staff." He also noted that he had submitted a draft petition for constructive criticism, and that the borough, but not the city, had responded with comments. Lowell insisted that members of the consolidation committee would still be willing to meet with the council "to resolve any concerns they may have."

Lowell submitted his final version of the consolidation petition to Hayes on May 18, 2000. According to Hayes, Lowell "refused to answer questions about certain elements of the proposed consolidation," "did not deny that he had failed" to "consult with the City in formulating the transition plan," and "indicated that working with the City was unimportant, because the LBC would refer his

petition regardless of his lack of consultation." Lowell allegedly implied "that he had an 'inside line' with the LBC and that he was not required to 'consult' with the City because the LBC would 'do whatever [Lowell] wanted with respect to the consolidation issue.'"

The city filed with the LBC in July 2000 a brief opposing consolidation, and an affidavit from Hayes alleging that Lowell had failed to consult with city officials. Lowell submitted a response brief in which he explained that he "had planned to meet with City department heads and with the City Council on the transition plan," but instead "found most of the required information from public records and discussed the transition plan with some city personnel by phone or visit where questions arose." Lowell's response also stated that he had "provided Mayor Hayes with a draft copy of the full petition requesting City review for correction and constructive criticism." Lowell furnished a copy of the relevant parts of this brief to Hayes.

The LBC apparently determined that Lowell's petition was adequate for submission to the city and borough voters for a special election on the consolidation issue. The election was held on August 28, 2001, and the voters rejected the proposal. The following day, Hayes sent a letter to the Chair of the LBC. Hayes mentioned that Lowell "falsely claimed, by affidavit, that the petition plan was 'developed in consultation with officials of municipal governments'" yet "personally admitted to me that his claim was untrue." Hayes suggested that "[a] number of improvements should be made to prevent a reoccurrence of this type of flawed petition process," including the adoption and enforcement of "[r]egulations that provide sanctions" for behavior like Lowell's. Copies of this letter were apparently forwarded to the city council, local legislators, and a local newspaper.

Soon after, Lowell's attorney wrote to Hayes. His letter noted that by accusing Lowell of filing a perjured affidavit, Hayes had engaged in libel *per se*. The letter also accused "a city attorney" of threatening criminal action against Lowell in violation of his civil rights. The letter warned that a lawsuit was imminent if Hayes failed to apologize and correct his misquotes of Lowell's affidavits. In the weeks that followed, Hayes and Kuss wrote several letters to Lowell's attorney, re-alleging their assertions that Lowell had falsely claimed to have consulted with city officials. These letters were circulated to and excerpted in the local press.

### B. Proceedings

Lowell filed suit against the defendants on October 8, 2001 seeking actual and punitive damages for defamation and violation of his civil right to petition the government. An amended complaint filed on December 3, 2001 added a request for a declaratory judgment that the defendants violated Lowell's civil rights. On March 15, 2002 the superior court granted the defendants' Civil Rule 12(b)(6) motion to dismiss Lowell's claim for violation of his civil rights. Lowell filed a second amended complaint on May 28, 2002, in which he requested a declaratory judgment that the defendants had falsely accused him of perjury.

As part of the pre-trial discovery process, the defendants submitted to Lowell a request for an admission that he was a public figure with respect to the consolidation issue. Lowell's only response was "Deny." The defendants then moved for summary judgment on the issue of whether Lowell was a public figure. The superior court rejected Lowell's arguments against the motion,[1] held that as a matter of law Lowell is a public figure for purposes of this controversy, and granted the defendants' motion on August 1, 2002.[2] The court then imposed on Lowell the expenses incurred by the defendants in litigating the

---

1. Lowell admitted that he had been a public figure "in the context of the Fairbanks City–Borough Consolidation issue between April 1998 and August 28, 2001." But following the consolidation petition's election defeat on the latter date, Lowell claimed, it ceased to be a public issue, and Lowell "retired from any further activities related to consolidation." Lowell argued

that "a public figure ceases to be a public figure when the controversy into which he injects himself ceases to be a public controversy."

2. Lowell does not dispute the substantive determination of this issue on appeal.

motion, pursuant to the defendants' Civil Rule 37 motion.

On November 14, 2002 the superior court granted the defendants' Rule 12(b)(6) motion to dismiss as non-justiciable Lowell's requests for declaratory relief.

On December 3, 2002 the court granted the defendants' motion for summary judgment on Lowell's defamation claim in its entirety, finding that as a matter of law the defendants did not publish their statements with actual malice. Shortly thereafter, the superior court dismissed with prejudice "all claims brought or which could have been brought" by Lowell against the defendants.

The defendants had served Lowell with a Civil Rule 68 "Offer of Judgment" several months after he filed his claim. The defendants had proposed, "without admitting any fault or liability of any kind," that a $1.00 judgment be entered against each individual defendant for Lowell's defamation claim, and that a $1.00 judgment be entered against the defendants collectively for Lowell's civil rights claim. That is, the defendants offered Lowell a total of four dollars to settle the lawsuit. Lowell rejected the offer, and instead offered to settle the whole case for $0 and a written apology signed by Hayes and Kuss. The defendants rejected this offer. Following the superior court's entry of final judgment in their favor, the defendants moved for and were awarded attorney's fees and costs in excess of $40,000. Lowell has appealed each of these decisions.

3. *Mt. Juneau Enters., Inc. v. Juneau Empire*, 891 P.2d 829, 834 (Alaska 1995).

4. *Id.*

5. *Angnabooguk v. State, Dep't of Natural Res.*, 26 P.3d 447, 451 (Alaska 2001).

6. *Id.*

7. *Brause v. State, Dep't of Health & Soc. Servs.*, 21 P.3d 357, 358 (Alaska 2001). Lowell asserts that "[i]n reviewing the trial court's exercise of discretion to grant or refuse declaratory relief, the appellate court may substitute its judgment for that of the lower court." Lowell cites *Jefferson v. Asplund*, 458 P.2d 995, 998 (Alaska 1969), in support of this assertion. In *Jefferson* we did

## III. STANDARD OF REVIEW

In reviewing a grant of summary judgment, we examine whether a genuine issue of material fact existed to preclude judgment as a matter of law, drawing all reasonable factual inferences in favor of the non-moving party.[3] In an action for defamation brought by a public figure, we will reverse a grant of summary judgment for the defendant if there is any genuine factual question that the defendant entertained serious doubts as to the truth of his statements.[4]

We review dismissals pursuant to Civil Rule 12(b)(6) *de novo*, construing the dismissed complaint liberally, and assuming the truth of all facts it alleges.[5] Rule 12(b)(6) dismissals are viewed with disfavor and should only be granted on the rare occasion where "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." [6]

In light of the significant role of judicial discretion in the administration of declaratory judgment, we will reverse the dismissal of a declaratory judgment action that is based on prudential grounds only when we find that the superior court abused its discretion.[7]

We review *de novo* those exceptions to Rule 37(c)(2) sanctions that raise legal questions.[8] We review for clear error those exceptions to Rule 37(c)(2) sanctions that rely on factual findings.[9]

Whether Rule 68 is applicable to a given case is a question of law.[10] Where Rule 68

not adopt the "substituted judgment" standard of review, which had been suggested by Professor Moore. *Id.* (citation omitted). Rather, we merely noted Moore's proposed standard, and warned that "we choose to make no comment upon the merits of his thesis." *Id.* We instead stressed the clearly "significant role" of judicial discretion in the declaratory process. *Id.* at 997.

8. *Dobos v. Ingersoll*, 9 P.3d 1020, 1026 (Alaska 2000) (citing *Strong Enters., Inc. v. Seaward*, 980 P.2d 456, 458 (Alaska 1999)).

9. *Id.* (citing *Cockerham v. State*, 933 P.2d 537, 539 n. 9 (Alaska 1997)).

10. *Van Deusen v. Seavey*, 53 P.3d 596, 603–4 (Alaska 2002).

applies, we review the lower court's determination of the prevailing party [11] and the amount awarded [12] for abuse of discretion.

## IV. DISCUSSION

### A. The Superior Court Properly Granted Summary Judgment on Lowell's Defamation Claim.

■ Under the First Amendment of the U.S. Constitution, a public figure can win damages for defamation only where he can prove that the defendant published the defamatory statement at issue with "actual malice." [13] Prior to granting the defendants' motion for summary judgment, the superior court had determined as a matter of law that Lowell was a public figure for purposes of the events surrounding his consolidation petition, and therefore this lawsuit. Lowell does not challenge this conclusion on appeal. The issue on appeal is thus whether, as the superior court concluded, Lowell failed to raise a genuine issue of fact regarding the defendants' "actual malice" that could have precluded judgment.

■ "Actual malice" involves a subjective inquiry into a speaker's intent—specifically, whether he knew that his defamatory statement was false or recklessly disregarded the possibility of its falsity. [14] A plaintiff "must prove by clear and convincing evidence that the declarant acted with knowledge of the statement's falsity or in reckless disregard of the statement's truth or falsity." [15] "To show that a declarant recklessly disregarded the truth or falsity of published material," a plaintiff must show that the declarant " 'entertained serious doubts as to the truth of the publication.' " [16] A defendant's "[f]ailure to make a prior investigation into the accuracy of published statements" does not, by itself, constitute actual malice. [17] Neither does a defendant's incorrect usage of a key term or word whose meaning is reasonably disputed. [18] Thus, "[t]he actual malice standard is a difficult one to satisfy." [19]

Nevertheless, we have refused to adopt the federal standard for summary judgment on defamation claims, under which summary judgment is granted unless the plaintiff has shown actual malice by clear and convincing evidence. [20] Concluding that the federal standard " 'intrudes into the province of the jury,' " [21] we have "decline[d] to incorporate the applicable substantive evidentiary standard into this state's summary judgment practice." [22] Thus, "it is somewhat harder for a libel defendant to win summary judgment in our state courts" than in federal courts. [23]

■ A finding that a defendant lacked actual malice may or may not be based on his own testimony; a defendant cannot "auto-

11. *Glamann v. Kirk,* 29 P.3d 255, 259 (Alaska 2001); *Andrus v. Lena,* 975 P.2d 54, 58 (Alaska 1999).

12. *Van Deusen,* 53 P.3d at 603 n. 23.

13. *Mt. Juneau Enters., Inc. v. Juneau Empire,* 891 P.2d 829, 834–35 (Alaska 1995) (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 283, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)).

14. *Id.,* 891 P.2d at 834 (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 283, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

15. *Moffatt v. Brown,* 751 P.2d 939, 941 (Alaska 1988).

16. *Mt. Juneau,* 891 P.2d at 838 (citing *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)).

17. *Id.* (citing *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 84–85, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967)).

18. *Moffatt,* 751 P.2d at 945–46 (defendant's reference to "boycott" of abortion procedures by hospital nursing staff, while technically incorrect, was not malicious where defendant had been told that "the nursing staff objected" to abortionist's methods, that ever-increasing number of nurses refused to assist in abortions, and that hospital was forced to obtain nurses from other communities).

19. *Id.* at 941.

20. *Id.* at 943.

21. *Id.* at 944, *quoting Dairy Stores, Inc. v. Sentinel Publ'g Co.,* 104 N.J. 125, 516 A.2d 220, 236 (1986).

22. *Id.* at 943.

23. *Id.* at 944.

matically insure a favorable verdict by testifying that he published with a belief that the statements were true."[24] But we have held that such testimony will suffice to counter a claim of actual malice where "(1) the plaintiff has failed to present conflicting evidence, and (2) the circumstances do not indicate that the statement was 'fabricated by the defendant, . . . the product of his imagination, . . . based wholly on an unverified anonymous telephone call . . . [or] so inherently improbable that only a reckless man would have put [it] in circulation.' "[25]

■ In this case, as the superior court noted, "[t]he ultimate dispute between the parties revolves around the definition of the word 'consultation.' " But because the test for actual malice is eminently subjective, the court correctly stated that "it does not matter what a court might determine the legal definition of 'consultation' in 3 AAC 110.900 to be," so long as the defendants' "concept of the term fell within a standard dictionary definition." The defendants presented affidavits and other testimonial evidence that they actually believed that Lowell had "failed to consult with city officials" as required by law, at least as far as the defendants understood this requirement.

Lowell indicated to Hayes that he intended to meet personally with Hayes, Kuss, and various city department heads to discuss his consolidation petition. Lowell does not dispute this fact. Hayes testified that his "understanding was that they were actually going to sit down, discuss it, work it, find out." Hayes later discovered that Lowell had in fact not met with any of the city department heads or chief officials, a fact that Lowell also did not dispute.[26] The superior court thus correctly held that the defendants' evidence amounted to a *prima facie* showing that their statements were not "fabricated," based on wholly unverifiable and suspect sources, or "inherently improbable." Lowell

was therefore required to present conflicting evidence in rebuttal.

In opposing the defendants' motion for summary judgment, Lowell argued that after he filed his petition, but before the defendants published their defamatory statements, "the Mayor had actual knowledge that consultation had taken place." Lowell presented evidence that he and Juanita Helms "consulted" in some way with city "officials," but the superior court held that Lowell's evidence did not suffice to show that the defendants actually knew, or should have known, of his relatively low-level, "vague," and indirect contacts with the city bureaucracy. Lowell had also submitted a draft of his consolidation petition to Hayes and the city for comments. But the superior court felt that while the defendants were certainly aware that Lowell had submitted this draft, Lowell offered no evidence that the defendants subjectively felt that submitting a draft constituted "consulting," particularly in light of Hayes's testimony that he "had a policy of not making official comments on the petition until it was finally filed." The superior court thus concluded that Lowell presented no evidence that the defendants' statements were made in bad faith or with serious doubt as to the truth of their content. We agree.

Lowell argues that he offered evidence that, during LBC hearings on his petition, the city put forward allegations that the petition contained false statements similar to the allegations at issue in this case. Lowell's response brief to the LBC explained, along essentially the same lines as his briefings in this lawsuit, that he had met with lower city officials and submitted a draft petition to Hayes. As Lowell reminded the superior court, the LBC subsequently "found that the Petition for Consolidation was sufficient and ordered an election." Thus, Lowell reasons, the LBC implicitly determined that he "had adequately consulted with city officials." And since Hayes received a copy of the relevant parts of the response, and the defendants were obviously aware of the LBC's

---

**24.** *Id.* at 942 (*quoting St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)).

**25.** *Id.* at 946 (*quoting St. Amant,* 390 U.S. at 732, 88 S.Ct. 1323).

**26.** Lowell and other members of the Consolidation Committee consulted instead with various lower-level city officials or workers, including a police lieutenant, the city Director of Public Works, and the city Surveyor.

decision, Lowell argues that they must have known that Lowell had in fact fulfilled the "consultation" requirement, or at least one reasonable interpretation of it.

Notably, however, Lowell's response brief to the LBC never affirmatively used the term "consult," and never explicitly stated that Lowell's low-level meetings, research, and submission of draft proposals constituted consultation. Similarly, even Lowell admits that his subsequent affidavit to the LBC "did not use the word 'consultation' or any derivation thereof." And though the LBC submitted Lowell's petition to the voters, it did not define "consultation," or expressly rule on whether Lowell had actually and adequately "consulted." The defendants also presented evidence that they believed that Lowell had an "inside line" or a well-placed friend at the LBC, and that "the LBC would approve [Lowell's] consolidation proposal regardless of the fact that he did not comply with the regulations regarding consultation with City staff." The defendants thus had reasonable grounds for thinking that Lowell did not regard his actions to be a form of consultation but instead intended to use them to avoid the consultation requirement. In sum, the content of Lowell's response brief to the LBC and the LBC's decision to approve the consolidation petition do not constitute evidence rebutting the defendants' testimony that their statements were not fabricated or inherently improbable. Accordingly, we affirm the superior court's decision to grant the defendants' motion for summary judgment on Lowell's defamation claim.

## B. The Superior Court Properly Dismissed Lowell's State Constitutional Claims.

Article I, Section 6 of the Alaska Constitution provides: "The right of the people peaceably to assemble, and to petition the government shall never be abridged." Lowell claims, as he did before the superior court, that the defendants "attempt[ed] to inhibit and otherwise limit the free exercise of [his] right to petition the government in a manner prescribed by law." According to Lowell, by "gratuitously attack[ing his] character" and threatening him with prosecution, the defendants intended to "warn other like-minded citizens of the dangers of petitioning the government." Lowell insists that he should have received monetary and declarative relief on this ground. The superior court dismissed this cause of action.

■ Federal courts allow direct tort actions for violation of certain provisions of the federal constitution, but only reluctantly, where no alternative remedies are available.[27] We have never recognized a *Bivens*-type private right of action for constitutional torts under the Alaska Constitution.[28] We have stated that we will not allow a constitutional claim for damages, "except in cases of flagrant constitutional violations where little or no alternative remedies are available."[29] This case meets neither requirement.

As the superior court noted, Lowell "does not allege that he was actually prevented from petitioning the government." Lowell was quite clearly afforded the right of petition; as even he admits, he did in fact submit a petition, and his petition was offered to the voters. Lowell does not allege any direct action on the part of the defendants to thwart his constitutional right. In fact, the defendants' actions only occurred after Lowell submitted his petition. Lowell alleges only that the defendants intended to discour-

**27.** *Thoma v. Hickel*, 947 P.2d 816, 824 n. 5 (Alaska 1997) (citing *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)).

**28.** *Id.; see also Vest v. Schafer*, 757 P.2d 588, 598 (Alaska 1988) (judiciary will not hold state liable for damages on grounds that legislature enacted statute later invalidated as unconstitutional); *Walt v. State*, 751 P.2d 1345, 1353 (Alaska 1988) (where legislature has provided administrative remedial system court does not address availabil-

ity of *Bivens*-type action); *State v. Haley*, 687 P.2d 305, 317–18 (Alaska 1984) (where there is statutory right of action court does not reach availability of *Bivens*-type action); *King v. Alaska State Hous. Auth.*, 633 P.2d 256, 259–61 (Alaska 1981) (concern over penalizing public duplicatively by awarding damages for rigged bidding constitutes "special factor counseling hesitation" in creating damages remedy under *Bivens* ).

**29.** *Dick Fischer Dev. No. 2 v. State of Alaska, Dep't of Admin.*, 838 P.2d 263, 268 (Alaska 1992).

age *future* petitioners like himself. Even assuming that all of Lowell's assertions are true, the constitutional violation he alleges, if there is one at all, is certainly not "flagrant." It amounts, at most, to an indirect or tacit threat to violate others' constitutional rights at an undetermined and uncertain point in the future.[30]

Moreover, the availability of alternative remedies for the defendants' actions is evident, as the superior court noted. Lowell sued the defendants for defamation. Lowell argues that "the trial court failed to consider the threats and intimidation of criminal prosecution by Kuss and Hayes, and rather focused only on the elements of the complaint that mirrored Lowell's defamation claims." To the extent that they were not intended merely to dissuade future petitioners (as discussed in the preceding paragraph), the defendants' "threats" never blossomed into an actual prosecution of Lowell.[31] They were at most, as Lowell suggests, part of the overall campaign by the defendants to discredit him. They were thus more properly considered a form of defamatory conduct, for which the appropriate remedy was Lowell's non-constitutional cause of action.

Lowell further argues that even if his claim for defamation was an adequate alternative remedy to a constitutional cause of action, it was "dismissed." Assuming this was proper, Lowell protests that he no longer has an alternative remedy available. This argument is facially untenable, and Lowell cites no authority to support it. Surely the inadequacy of alternative remedies for alleged constitutional violations cannot be measured *per se* by the dismissal or defeat of those remedies. If that were so, the perverse result would be that the more frivolous or unjustifiable a claim, the more it would merit an implied constitutional cause of action for damages. As we have not adopted *Bivens* and its progeny,[32] we have clearly not expressed any support for the broad proposition advanced by Lowell. At the time the superior court dismissed Lowell's constitutional cause of action, his defamation cause of action was still pending. Lowell had properly availed himself of this alternative remedy, and the superior court properly dismissed his implied constitutional tort cause of action.

**C. The Superior Court Properly Dismissed Lowell's Request for Declaratory Relief on His Defamation Claim.**

The superior court dismissed Lowell's requests for declaratory relief, holding them to

---

**30.** In *King*, 633 P.2d at 261 n. 5, we noted our agreement with the 5th Circuit's "flagrancy" requirement discussed in *Hearth, Inc. v. Dep't of Pub. Welfare*, 612 F.2d 981, 982 (5th Cir.1980). *Hearth* interpreted *Bivens* and *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), to provide a damages remedy against the Federal Government for a constitutional violation only when a violation is flagrant and no alternative remedy is available. In *Passman*, a female Congressional staffer sued a U.S. Congressman for depriving her of an employment interest on the basis of sex in violation of the 5th Amendment after he fired her explicitly because of her sex. *Passman*, 442 U.S. at 230–31, 99 S.Ct. 2264. In *Bivens*, the plaintiff sued Federal drug agents for violating his 4th Amendment rights after the agents mistook him for a drug dealer, entered his home without a warrant, manacled him in front of his wife and children, threatened his family with arrest, and searched his home—also without a warrant. *Bivens*, 403 U.S. at 389, 91 S.Ct. 1999. He was later taken into custody, interrogated, and subjected to a visual strip search. *Id.*

**31.** Lowell mentions *Burrell v. Disciplinary Bd. of Alaska Bar Ass'n*, 777 P.2d 1140 (Alaska 1989),

*In re Vollintine*, 673 P.2d 755 (Alaska 1983), and *In re Craddick*, 602 P.2d 406 (Alaska 1979), to prove that "threatened criminal prosecution by an attorney to gain advantage in a civil matter is wrongful conduct." That point is not disputed. But these cases do not strengthen Lowell's argument that defendants' behavior was "flagrant" and cannot be adequately punished by existing tort remedies because the wrongful conduct in each case was addressed by disciplinary proceedings—not an implied constitutional right of action. *Burrell*, 777 P.2d at 1141; *Vollintine*, 673 P.2d at 756–57; *Craddick*, 602 P.2d at 407–8. Moreover, the wrongful conduct in each of these cases was far more flagrant than the conduct in this case. In *Burrell*, the conduct was aggravated by the defendant's repeated offenses and his refusal to admit any wrongdoing. 777 P.2d at 1145. In *Vollintine*, the attorney explicitly threatened opponents in order to influence a *pending matter* and defamed an opponent as an incompetent and racist liar. 673 P.2d at 756–58. In *Craddick*, the Disciplinary Board found that the defendant committed "clear and flagrant" violations of Disciplinary Rules. 602 P.2d at 408.

**32.** *Thoma*, 947 P.2d at 824 n. 5.

be "non-justiciable because the grant of declaratory relief would not be a final and conclusive judgment and/or would not serve a useful purpose in light of the court's earlier dismissal of Lowell's state civil rights claim." Lowell appeals this decision. He argues that the superior court improperly dismissed his request for declaratory relief as to his defamation claim, because the U.S. Supreme Court has never applied its "actual malice" standard to defamation claims brought by public figures for relief other than damages; because a declaratory judgment for Lowell would counter the "aspersions respecting his character and reputation, which money damages may be limited to ameliorate"; because application of the actual malice standard to Lowell's defamation claims may render illusory his other avenues of relief, making declaratory relief a necessary substitute; and because despite the constitutional value in free speech, there should be no constitutional protection for public officials' false statements of fact.

### 1. Dismissal of Lowell's requested declaratory relief was within the superior court's discretion.

Alaska Statute 22.10.020(g) (the "Declaratory Judgment Act") "grants to superior courts the power to issue declaratory judgments in cases of actual controversy." [33] It states in relevant part: "In case of an actual controversy in the state, the superior court, upon the filing of an appropriate pleading, may declare the rights and legal relations of an interested party seeking the declaration, whether or not further relief is or could be sought." And Alaska Rule of Civil Procedure 57 states that "[t]he procedure for obtaining a declaratory judgment pursuant to statute shall be in accordance with [the civil] rules.... The existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." [34]

■ A complaint asking for declaratory relief must allege one or more facts demonstrating that the plaintiff is entitled to a declaratory judgment. [35] We have explained that declaratory judgments are rendered to clarify and settle legal relations, and to "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." [36] A court should decline to render declaratory relief when neither of these results can be accomplished. [37]

■ We have noted that Civil Rule 57 is "practically identical" to its federal counterpart, and that the formulation of Alaska's declaratory judgment provision makes it "apparent that our legislature intended to parallel the text of the federal Declaratory Judgment Act." [38] Because the Alaska and federal declaratory judgment acts and procedural provisions are "substantially similar," we "consider federal precedent pertinent" in our determination of declaratory judgment issues. [39]

The language of AS 22.10.020(g) suggests that declaratory relief may be allowed in any actual controversy. [40] But commentary suggests that declaratory relief is a tool for resolving controversies "that [have] not reached the stage at which either party may seek a coercive remedy" or "in cases in which a party who could sue for coercive relief has

---

**33.** *Brause v. State, Dep't of Health & Soc. Servs.,* 21 P.3d 357, 358 (Alaska 2001).

**34.** Alaska R. Civ. P. 57(a).

**35.** *Jefferson v. Asplund,* 458 P.2d 995, 1000 (Alaska 1969) ("[T]he requirements of pleadings in actions seeking declaratory relief do not differ from those standards of pleadings governing other types of civil actions.") (citing *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)); *see generally,* Alaska R. Civ. P. 8.

**36.** *Id.* at 997–98 (citing Borchard, *Declaratory Judgments* at 299 (2d ed.1941)).

**37.** *Id.* at 998.

**38.** *Id.* at 996 & n. 4. *Compare* Fed.R.Civ.P. 57 *and* 28 U.S. §§ 2201–2202 (Federal Declaratory Judgment Statute).

**39.** *Id.* at 997 n. 7.

**40.** AS 22.10.020(g) provides, in relevant part: "In case of an actual controversy in the state, the superior court, upon the filing of an appropriate pleading, may declare the rights and legal relations of an interested party seeking the declaration, whether or not further relief is or could be sought."

not yet done so."[41] That is, declaratory relief is generally used to settle a controversy that has yet to "ripen into violations of law,"[42] or "to afford one threatened with liability an early adjudication without waiting until an adversary should see fit to begin an action after the damage has accrued."[43]

In *Wilton v. Seven Falls Co.*,[44] the United States Supreme Court declared that the Federal Declaratory Judgment Act invests federal courts with "unique and substantial discretion in deciding whether to declare the rights of litigants."[45] Federal Courts " *'may* declare the rights and *other* legal relations of any interested party seeking such declaration.' "[46] The Alaska Declaratory Judgment Act employs language identical to the Federal Act and we have similarly interpreted the Alaska Declaratory Judgment Act such that Alaskan superior courts " 'may declare the rights and legal relations' of an interested party seeking the declaration."[47] Declaratory relief is a "nonobligatory remedy" and the Federal Declaratory Judgment Act "created an opportunity, rather than a duty" for federal courts to grant relief to qualifying litigants.[48] "In the declaratory judgment context," the Court noted, "the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration."[49] A court that "know[s] at the commencement of litigation that it will exercise its broad statutory discretion to decline declaratory relief," need not undertake a "wasteful expenditure of judicial resources" in "the futile exercise of hearing a case on the merits first."[50]

As occurred in *Wilton*, federal courts often refuse to hear declaratory judgment claims because parallel proceedings, particularly those in other jurisdictions, present the same issues.[51] Similarly, where the same proceeding offers a plaintiff alternative remedies, though the existence of other remedies does not preclude declaratory judgment *per se*, the court in its discretion "properly may refuse declaratory relief if the alternative remedy is better or more effective."[52]

As explained above, a trial court has wide discretion to determine that a request for declaratory relief is inappropriate. Lowell's defamation claim arose out of statements that the defendants had already made, not that they were likely to make or threatened to make. Thus, by the time Lowell brought suit, the dispute at issue had already "ripened" into an alleged actual violation of law. The superior court therefore did not abuse its discretion in determining that the coercive remedies available to Lowell would be more effective, or "final and conclusive."

### 2. The "actual malice" standard applies to defamation claims for declaratory relief.

■ We can quickly dispose of Lowell's argument that because the "actual malice" standard does not apply to requests for declaratory remedies, declaratory relief would in fact be a more effective remedy, or his only remedy if we affirm summary judgment. It is true, as Lowell suggests, that in both *New York Times Co. v. Sullivan*[53] and *Gertz*

41. Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure. Civil § 2751 at 456 (3d ed.1998).

42. *Id.* at 457–58.

43. *Id.* at 457.

44. 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

45. *Id.* at 286, 115 S.Ct. 2137.

46. *Id.* (emphasis in original).

47. *Asplund*, 458 P.2d at 997 (quoting 28 U.S.C. § 2201).

48. *Wilton*, 515 U.S. at 288, 115 S.Ct. 2137.

49. *Id.*

50. *Id.* at 287–88, 115 S.Ct. 2137.

51. Wright, Miller & Kane, *supra* note 41, §§ 2758–59; *Wilton*, 515 U.S. at 279–82, 115 S.Ct. 2137.

52. Wright, Miller & Kane, *supra* note 41, § 2758 at 513.

53. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

*v. Robert Welch, Inc.*[54] the Supreme Court required "actual malice" in claims for coercive relief but did not address declaratory relief. However, an action for declaratory relief is procedural and remedial, not substantive.[55] Declaratory judgments vindicate substantive rights—they do not create them.[56] To the extent that the law offers a public figure no substantive right to seek coercive remedies for non-malicious defamation, it also offers him no right to seek declaratory relief for that defamation.[57]

There is also a strong public policy ground for rejecting Lowell's argument. In *New York Times,* the Supreme Court emphasized the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."[58] Such debate would be intolerably curtailed by the self-censorship that inevitably arises under the common law rules of defamation (particularly the rule that defendants bear the burden of proving the truth of their statements), because "erroneous statement is inevitable in free debate."[59] The vital logic underpinning *New York Times, Gertz,* and many other First Amendment cases is that erroneous but non-malicious speech on public issues "must be protected if the freedoms of expression are to have the breathing space that they need to survive."[60]

The reasoning of *New York Times* should apply even to claims that seek only declaratory relief. While not presenting the threat of monetary damages, they nonetheless impose the same litigation costs and burdens on a

defendant, as well as the same threat of reputational harm. Allowing actions for declaratory judgments to proceed without the requirement of "actual malice" is likely to intolerably chill free speech and public debate. The actual malice standard should therefore apply to any form of defamation claim brought by a public figure. In sum, where "false statements of fact" regarding a public figure are made without malicious intent, they are constitutionally protected and should not be considered grounds for any form of relief, declaratory or otherwise.

### 3. Declaratory relief was not an appropriate remedy for any alleged criminal prosecution threats against Lowell.

Lowell also argues that dismissal of his plea for declaratory judgment regarding his defamation claim was improper because a declaratory judgment would clarify and settle the issue of whether the defendants are permitted to threaten Lowell with prosecution for his alleged perjury. To the extent that this argument is distinct from Lowell's appeal of the dismissal of his state constitutional claims, discussed above in Part IV.B, we reject it.

Because Alaska's Declaratory Judgment Act and its federal counterpart require an "actual controversy" as a prerequisite to granting declaratory relief, we have held that a trial court has discretion to deny such relief where it determines that a plaintiff lacks standing to sue, or the claim lacks ripeness.[61]

**54.** 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

**55.** *Jefferson v. Asplund,* 458 P.2d 995, 997 (Alaska 1969).

**56.** *Id.*

**57.** *See, e.g., Int'l Ass'n of Machinists & Aerospace Workers v. Tennessee Valley Auth.,* 108 F.3d 658, 668 (6th Cir.1997) (claim for declaratory relief is "barred to the same extent that the claim for substantive relief on which it is based would be barred").

**58.** *New York Times,* 376 U.S. at 270, 84 S.Ct. 710.

**59.** *Id.* at 271, 84 S.Ct. 710.

**60.** *Id.* at 271–72, 84 S.Ct. 710 (quotations omitted).

**61.** *Brause v. State, Dep't of Health & Soc. Servs.,* 21 P.3d 357, 358 (Alaska 2001). The requirement of "standing" means that the plaintiff must have a "sufficient stake in an otherwise justiciable controversy," and must have "been injured or been threatened with the injury by governmental action complained of." *Best v. Municipality of Anchorage,* 712 P.2d 892, 895 n. 4 (Alaska App.1985) (quoting BLACK'S LAW DICTIONARY 1260–61 (rev. 5th ed.1979)). The requirement of "ripeness" means there must be "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Brause,* 21 P.3d at 359 (quoting 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD

Based on considerations of standing or ripeness, federal courts are generally "disinclined" to provide declaratory relief to foreclose a threat of prosecution unless it is "reasonably clear and specific." [62] The First Circuit has noted that "just how clear the threat of prosecution needs to be turns very much on the facts of the case and on a sliding-scale judgment that is very hard to calibrate." [63] The court noted a trend toward the "practical approach" of requiring "realistic inferences that show a likelihood of prosecution." [64]

Lowell's assertion that he was, and still is, faced with criminal prosecution is apparently based entirely on the allegations in his own complaint. According to Lowell, "Mr. Kuss ... threatened to bring criminal charges against Mr. Lowell in a conversation with Mr. Bockhorst, a staffer with the Local Boundary Commission. Mr. Hayes repeated that threat in his letter to Kevin Warring, by urging that sanctions should be applied to Mr. Lowell." But Lowell offers no citations to the record to support this claim, and the record offers ample evidence refuting it. Prior to the onset of litigation, Kuss wrote a letter to Lowell's attorney, insisting that Lowell had mischaracterized his legal discussions with Bockhorst. An affidavit submitted by Kuss states: "At no time during my conversation with Mr. Bockhorst did I threaten to bring a criminal prosecution against Mr. Lowell because of the statements in his proposed October 1998 petition and affidavit." An affidavit submitted by Hayes states that the first time he heard of any threats to criminally prosecute Lowell was when Lowell himself mentioned them in a meeting. The superior court thus acted, to be sure, well within its discretion in finding any alleged criminal prosecution threats against Lowell

insufficiently "clear and specific" to support a claim for declaratory relief.

### D. The Superior Court Properly Imposed the Defendants Attorney's Fees and Sanctions Under Civil Rule 37(c) for Lowell's Failure To Admit His Public Figure Status.

Lowell claims that the superior court's decision to award attorney's fees to the defendants under Rule 37(c) was improper.

Civil Rule 37 states in relevant part:

> If a party fails to admit ... the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves ... the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court *shall* make the order *unless* it finds that (A) the request was held objectionable pursuant to Rule 36(a), or (B) the admission sought was of no substantial importance, or (C) the party failing to admit had reasonable ground to believe that the party might prevail on the matter, or (D) there was other good reason for the failure to admit.[65]

Thus, where a party fails to admit the truth of a matter, and the opposing party requests Rule 37(c)(2) sanctions, they are mandatory if none of the four listed exceptions applies.[66] Since the superior court found that Lowell had failed to admit the truth that he was a public figure, the court had no choice but to sanction Lowell, unless a Rule 37(c)(2) exception applied. Lowell's briefings suggest, though without explicitly stating, an argument under exception (A).[67]

---

H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3532, at 112 (2d ed.1984)).

62. *New Hampshire Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 4–5 (1st Cir.2000) (citing 13A WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 3532.5, at 175–80 (2d ed.1984)).

63. *Id.* at 5.

64. *Id.*

65. Alaska R. Civ. P. 37(c)(2) (emphasis added).

66. *Dobos v. Ingersoll*, 9 P.3d 1020, 1026 (Alaska 2000).

67. Since Lowell's public figure status was clearly a determination of vital importance to the outcome of his defamation claim, Exception (B) is inapplicable. If Lowell had "reasonable ground" or "other good reason" for failing to admit he was a public figure, he has not suggested it in his appellate briefings, and so Exceptions (C) and (D) do not apply.

In order to avoid Rule 37(c)(2)'s sanctions under Exception (A) of the rule, the superior court must find that the requested admission "was held objectionable pursuant to Rule 36(a)." According to Lowell, the defendants' request concerned a question of law and fact, and requests for admissions of law and fact are impermissible under Alaska's discovery rules.[68] Therefore, he reasons, the requested admission was objectionable,[69] and Rule 37(c)(2) penalties were inappropriate. But it is pure questions of law, not mixed questions of law and fact, that are generally considered improper matters for discovery.[70] Where, as here, the relevant facts are undisputed, "[t]he nearly universal rule is that determination of public figure status is a question of law for the court to determine."[71] Thus, Lowell's argument has some legal merit, although it misstates several aspects of the relevant law, because the defendants' request that Lowell admit that he was a public figure was objectionable.

■ But Lowell's argument ignores the clear implications of Rule 37's wording. Rule 37(c)(2) does not except from sanctions parties who unilaterally determine that a request for admission "is" objectionable; it excepts a request actually "held" to be objectionable. A request for admission can be "held objectionable" only by a court of law. At no point was the defendants' request that Lowell admit to being a public figure held objectionable by the superior court. Exception (A) to Rule 37(c)(2) is thus inapplicable.

■ On a more general level, Lowell waived his opportunity to object to the defendants' request for admission. Rule 36(a) states that a request for admission is considered admitted by the party upon which it is served, unless that party "serves upon the party requesting the admission a written answer or objection addressed to the matter. . . . If objection is made, the reasons therefor shall be stated." Nowhere does the record indicate that Lowell objected to, or stated any reasons for objecting to, the defendants' request at the time he answered it. Lowell simply responded "Deny." This response implied that Lowell did not object to the legal validity of the defendants' request for admission, and intended to litigate his public figure status on the substantive merits. And Lowell then proceeded to litigate only the substantive issue of his status. In his "Partial Opposition" to the defendants' motion for summary judgment on the public figure issue, Lowell contested his public figure status for purposes of this case, but failed to object to the form or nature of the requested admission itself. It was only after the superior court rejected this argument and considered sanctioning Lowell that Lowell changed tack and argued that the requested admission had been improper from the beginning.

Alaska's Rules of Civil Procedure are construed to further the "speedy and inexpensive determination of every action and proceeding."[72] In this spirit, Rule 36 is "intended to expedite litigation through the elimination of uncontested issues,"[73] and

---

**68.** Lowell's briefing also seems to suggest a privilege or attorney work-product exemption from the requested admission. The point is insufficiently explained and supported, and we do not consider it.

**69.** Lowell actually bases his argument that the request was objectionable on Rule 26(b)(1), rather than Rule 36(a), as Exception (A) requires.

**70.** Rule 36(a) states in relevant part that "[a] party may serve upon any other party a written request for the admission . . . of the truth of any matters . . . that relate to statements or opinions of fact *or of the application of law to fact.*" (Emphasis added.) This language clearly indicates that a party may not request the admission of a purely legal conclusion, though neither the text of the rule nor this court's caselaw make the point explicitly. Federal cases interpreting Rule 36(a)'s identical federal counterpart have held that requests for pure admissions of law are improper. *See, e.g., Reliance Ins. Co. v. Marathon LeTourneau Co.,* 152 F.R.D. 524, 525 n. 2 (S.D.W.Va.1994); *Williams v. Krieger,* 61 F.R.D. 142, 144 (S.D.N.Y.1973).

**71.** *Mt. Juneau Enters., Inc. v. Juneau Empire,* 891 P.2d 829, 835–36 (Alaska 1995) (citations omitted) (holding that determination of individual's public figure status "may be resolved on summary judgment if the facts relating to public figure status are uncontroverted").

**72.** Alaska R. Civ. P. 1.

**73.** *Riley v. N. Commercial Co., Mach. Div.,* 648 P.2d 961, 965 (Alaska 1982).

Rule 37 is obviously meant to encourage compliance with Rule 36. Since Lowell clearly failed to abide by the procedural requirements of Rule 36(a), he cannot avoid Rule 37(c)(2) sanctions, even if he later discovered a legal basis for doing so.

### E. The Trial Court Properly Awarded the Defendants Enhanced Attorney's Fees.

Lowell challenges the superior court's decision to award the defendants Rule 68 attorney's fees.[74] Rule 68, as applicable to cases filed after August 7, 1997, states in relevant part:

(a) [Either party] may serve upon the adverse party an offer to allow judgment to be entered in complete satisfaction of the claim for the money or property or to the effect specified in the offer. . . .

(b) If the judgment finally rendered by the court is at least 5 percent less favorable to the offeree than the offer, or, if there are multiple defendants, at least 10 percent less favorable to the offeree than the offer, the offeree . . . shall pay all costs as allowed under the Civil Rules and shall pay reasonable actual attorney fees incurred by the offeror from the date the offer was made as follows:

(1) if the offer was served no later than 60 days after both parties made the disclosures required by Civil Rule 26, the offeree shall pay 75 percent of the offeror's reasonable actual attorney fees

. . . .

(c) If an offeror receives costs and reasonable actual attorney fees under paragraph

(b), that offeror shall be considered the prevailing party for purposes of an award of attorney fees under Civil Rule 82.

#### 1. The defendants' settlement offer was valid.

■ Lowell argues that because the defendants' Rule 68 settlement offer "contained an express reservation that it was made 'without admitting any fault or liability of any kind,'" it did not meet Rule 68's "very specific" requirement that the offeror have judgment entered in complete satisfaction of the claim. But, Lowell offers no support for his interpretation of Rule 68, and the general rule is that a Rule 68 settlement offer may include language that the offer is not an admission of liability.[75] Thus, we hold that the defendants' offer was valid for Rule 68 purposes.[76]

#### 2. The superior court did not abuse its discretion in awarding Rule 68 fees to the defendants.

Lowell offers two arguments as to why the superior court abused its discretion. First, he argues that the defendants' judgment of zero dollars and no apology was "clearly" not more favorable than Lowell's settlement offer of zero dollars and an apology. Second, Lowell suggests that defendants were not entitled to Rule 68 fees because his offer to settle the case for zero dollars and an apology "bettered" the defendants' four-dollar settlement offer. We reject both of these arguments.

---

**74.** Lowell does not challenge the award of fees under Rule 82, insofar as the defendants were the prevailing party. Lowell also does not challenge the specific amounts of fees claimed by the defendants and awarded by the superior court.

**75.** *See McCauley v. Trans Union, L.L.C.,* 402 F.3d 340, 341–42 (2d Cir.2005) (citing *Cathas v. Local 134 IBEW,* 233 F.3d 508, 512 (7th Cir.2000)) (Rule 68 offer may contain disclaimer of liability). *See also* CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 3002 at 93 n. 20 (2d ed.1997) (citing relevant cases).

**76.** Lowell does not challenge the defendants' offer as unreasonable or made in bad faith. A Rule 68 offer of judgment may be invalid where a

party disingenuously makes a low offer so that it may benefit from Rule 68. *See Beattie v. Thomas,* 99 Nev. 579, 668 P.2d 268, 274 (1983) (In determining the validity of Rule 68 offers, trial courts should consider "(1) whether the plaintiff's claim was brought in good faith; (2) whether the defendants' offer of judgment was reasonable and in good faith in both its timing and amount; (3) whether the plaintiff's decision to reject the offer and proceed to trial was grossly unreasonable or in bad faith; and (4) whether the fees sought by the offeror are reasonable and justified in amount."). However, we need not reach this issue because Lowell does not raise it.

In regard to Lowell's first argument, we note that the final judgment was more favorable to the defendants than Lowell's offer because they did not have to apologize. Lowell admits that it is "rather obvious" that he was primarily interested in an apology. For him then to argue that the defendants did not do better at trial because the apology is valueless, or that it might even have "negative" value as he suggests, is illogical. We need not decide whether an apology is worth ten percent of the judgment. It is enough to observe that Lowell's primary goal was an apology and that the defendants secured a judgment better than his offer by not having to give one.[77]

As to Lowell's second argument—that his offer "bettered" the defendants' offer—it is irrelevant. Rule 68 requires the court to compare each individual offer to the final judgment, not that it weigh parties' offers against each other. "The purpose of Civil Rule 68 is to encourage settlement in civil cases and to avoid protracted litigation."[78] The rule encourages settlement by creating an incentive for parties to accept offers that approach their own estimation of what they might secure at trial.[79] Because Rule 68 requires only that the court compare the offer of judgment against the judgment itself, Lowell's second argument is irrelevant.

Because the final judgment was in fact *more* favorable to the defendants than Lowell's offer, we conclude the court acted within its discretion. Similarly, the superior court did not abuse its discretion in determining that its final judgment was more than ten percent less favorable to Lowell than the defendants' pre-trial offer to settle the case for four dollars and no apology. The court thus did not abuse its discretion in awarding Rule 68 attorney's fees to the defendants.

## V. CONCLUSION

Because Lowell did not raise a genuine issue of material fact regarding defendants' actual malice, we affirm the award of summary judgment against him on his defamation claim. Because this case presents neither a flagrant constitutional violation nor a situation where other remedies for any violation do not exist, we affirm the superior court's denial of Lowell's implied constitutional tort cause of action. Because the superior court did not abuse its discretion in denying Lowell's claim for declaratory relief, the actual malice standard applies to defamation claims for declaratory relief, and declaratory relief was not an appropriate remedy for threatened criminal prosecution against Lowell, the superior court properly dismissed Lowell's request for declaratory relief. Because Civil Rule 37(c) sanctions and attorney's fees may be imposed for a failure to admit that which the requesting party later proves, and no exceptions under the rule apply here, the superior court did not abuse its discretion in imposing sanctions and fees. Finally, because defendants' valid settlement offer which was more favorable to the defendants was not accepted by Lowell, the superior court was within its discretion in awarding fees under Civil Rule 68.

For these reasons, we AFFIRM the decision of the superior court in all respects.

---

**77.** *Cf. Domanski v. Funtime*, 149 F.R.D. 556, 558 (N.D.Ohio 1993) (damages of $5,581 and permanent injunction held more favorable than offer of $9,500); *Lish v. Harper's Magazine Found.*, 148 F.R.D. 516, 519 (S.D.N.Y.1993) (finding of copyright violation and vindication of author's right to control first publication held more favorable than offer of $250).

**78.** *Rules v. Sturn*, 661 P.2d 615, 616 (Alaska 1983).

**79.** Rule 68 "prompts both parties to a suit to evaluate the risks and costs of litigation, and to balance them against the likelihood of success upon trial on the merits." *Marek v. Chesny*, 473 U.S. 1, 5, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985).